## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
## EASTERN DIVISION

| | |
|---|---|
| LERVONDA JEFFRIES, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) No. 4:14CV1780 RLW |
| | ) |
| CAROLYN W. COLVIN, | ) |
| Acting Commissioner of Social Security, | ) |
| | ) |
| Defendant. | ) |

## MEMORANDUM AND ORDER

This is an action under 42 U.S.C. §§ 405(g) and 1383(c)(3) for judicial review of

Defendant's final decision denying Plaintiff's applications for Disability Insurance Benefits

("DIB") under Title II of the Social Security Act and for Supplemental Security Income ("SSI")

under Title XVI of the Act. For the reasons set forth below, the Court affirms the decision of the

Commissioner.

## I. Procedural History

On May 22, 2009, Plaintiff protectively filed an application for a period of disability and

Disability Insurance Benefits, as well as an application for Supplemental Security Income. (Tr.

105, 255-64) Plaintiff alleged that she became unable to work on April 1, 2006 due to thyroid

disease, high blood pressure, high cholesterol, depression, and joint pain. (Tr. 126, 255) The

applications were denied, and Plaintiff filed a request for a hearing before an Administrative Law

Judge ("ALJ"). (Tr. 99-102, 126-133) On January 6, 2011, Plaintiff testified before an ALJ.[1]

(Tr. 42-63) On May 3, 2011, the ALJ determined that Plaintiff had not been under a disability

---

[1] Plaintiff originally appeared at a hearing on August 30, 2010, but her attorney did not show up.
The ALJ advised Plaintiff that she needed legal representation and ended the hearing. (Tr. 36-
41)

from April 1, 2006, through the date of the decision. (Tr. 105-15) Plaintiff then filed a request for review, and on October 31, 2012, the Appeals Council granted Plaintiff's request for review and remanded the case to the ALJ for additional proceedings. (Tr. 120-24) On April 29, 2013, the ALJ held another hearing, and on June 11, 2013, the ALJ found that Plaintiff was not under a disability from September 28, 2009 through the date of the decision.[2] (Tr. 17-30, 64-98) The Appeals Council denied Plaintiff's request for review on August 18, 2014. (Tr. 1-3) Thus, the decision of the ALJ stands as the final decision of the Commissioner.

## II. Evidence Before the ALJ

At the April 29, 2013 hearing before the ALJ, Plaintiff was represented by counsel. Upon questioning by the ALJ, Plaintiff testified that she lived with her sister and Plaintiff's son, who received social security disability. Plaintiff had one year of college and training as a receptionist secretary. She previously worked as a receptionist secretary for Humana; an administrative assistant and data entry clerk for Alliance for Community Health; a reservationist for Enterprise Rent-A-Car; and a candy assembler for Karl Bissinger. Plaintiff did not recall being self-employed in 2007. She received worker's compensation in 2006 or 2007, but could not remember the exact year. (Tr. 66-72)

Plaintiff was also questioned by her attorney. She testified that she was born June 16, 1964. She weighed 232 pounds and measured 5 feet 11 inches. Plaintiff stated that she was unable to work because she had problems getting along with people. In addition, she did not have the motivation. Her diagnoses were bipolar disorder, schizophrenia, and schizoaffective disorder. She was diagnosed by Dr. Graypel, a psychiatrist, in 2011. Plaintiff also had arthritis, hypothyroidism, high blood pressure, and high cholesterol. Plaintiff testified that she had seen

---

[2] Plaintiff amended her alleged onset date to September 28, 2009 from her original date of April 1, 2009. (Tr. 293)

2

several psychiatrists for her mental health problems. Dr. Baird was her family doctor. At the time of the hearing, Plaintiff was hearing voices and was very depressed. She stated that she was depressed most of the time. She experienced crying spells weekly. Plaintiff also had trouble sleeping, concentrating, and remembering things. (Tr. 73-78)

Plaintiff testified that her normal weight was 170 pounds, but she had gained weight over the past five years. She had trouble being around other people and tried to stay to herself. She did not engage in any social activities. She had thoughts of suicide and was irritable with people. Plaintiff also experienced pain in her knees, right hip, and right hand. She testified that she could stand for a half hour, walk a half block, and sit for about 20 or 30 minutes. Her hip hurt, and her knee locked while she sat. Plaintiff was unable to go up and down a flight of stairs. She could lift and carry no more than five pounds with her right hand. She was right handed, so she did not lift anything with her left hand. Plaintiff could not crouch and get back up. She was able to bend at the waist and reach overhead. (Tr. 78-83)

Plaintiff spent most of the day in a reclining position with her legs elevated. Plaintiff's knees swelled, and elevating her legs helped reduce the swelling. She also took medication. The medication caused headaches and nausea. During a typical day, Plaintiff woke up around 6:00 a.m. She ate breakfast and took her medication. Her energy level was not good through the day. She tried to take naps but was unable to go to sleep. Plaintiff did not cook; her sister prepared the meals. While Plaintiff's sister worked, Plaintiff ate food she could microwave. Plaintiff and her sister both cared for Plaintiff's son. She testified that her son was disabled, with diagnoses of schizophrenia and diabetes. He was 31 years old and was able to give himself insulin shots. Plaintiff's sister did the grocery shopping, and Plaintiff rarely went along. She sometimes did dishes, but she did not clean the house. Plaintiff further testified that she did not sweep or

3

vacuum, do laundry, or perform yard work. She was able to care for herself but sometimes needed help putting on and tying her shoes. (Tr. 83-87)

Plaintiff stated that she spent her day either in bed or in a chair. She sometimes watched TV, but she did not read. She had contact with her niece and nephew. Plaintiff had no friends, and she did not talk to neighbors. She got in arguments with other people because they were annoying and always talking about her. Plaintiff avoided crowds and did not go out on a regular basis. She did not drink alcohol or use street drugs. (Tr. 87-89)

Plaintiff testified that she stopped working because she became depressed. However, the ALJ noted that Plaintiff previously reported that she stopped working because the company downsized and eventually closed. Plaintiff clarified that she was fired before the company closed. (Tr. 90)

A vocational expert ("VE") also testified at the hearing. The VE first listed Plaintiff's past work experience. Plaintiff had worked as a secretary, which was a sedentary, skilled position; data entry/secretary, which was a light, semi-skilled job; general utility helper, which was medium, unskilled work; and a reservationist, which was a light, semi-skilled job. The ALJ noted that Plaintiff's medical records and testimony suggested that she was limited to light exertional work. She could occasionally kneel but should avoid ropes, ladders, and scaffolding. Due to her mental impairment, Plaintiff was limited to unskilled work. The ALJ then asked the VE whether Plaintiff could perform any of her past relevant work in light of these limitations. The VE testified that Plaintiff was unable to perform any past jobs. (Tr. 91-92)

The ALJ then asked whether a hypothetical individual could perform other jobs where that individual had the same education, vocational background, and residual functional capacity ("RFC") as the Plaintiff. The VE answered that the person could perform the jobs of fast food

4

worker, cashier, and housekeeping cleaner. These jobs were light and unskilled positions that existed in significant numbers both nationally and in Missouri. (Tr. 92-93)

Plaintiff's attorney then asked the VE to assume additional limitations. The hypothetical individual had a marked inability to maintain her composure in the workplace without breaking down and crying or without arguing with another person or disturbing the peace in the workplace. In addition, the person had a marked inability to get along with coworkers. The attorney defined "marked" as a limitation that seriously interfered with the ability to function independently, appropriately, and effectively. Given these further limitations, the VE testified that the person could not perform the jobs mentioned earlier. The attorney then asked the VE to assume an extreme limitation in the individual's ability to cope with stress, maintain reliability, relate in social situations, interact with the general public, work in coordination with others, make simple decisions, and perform at a consistent pace. The VE answered that the individual could not perform the jobs previously listed or any other jobs. (Tr. 94-97)

In a Disability Report – Adult Plaintiff stated that she could no longer work because she would sometimes faint and tremble uncontrollably. She was unable to concentrate and became angry when she forgot what she was doing. Her body hurt, and she experienced crying spells and mood swings. Plaintiff further reported that she stopped working because the company downsized. She also lost family members, and she became extremely depressed. (Tr. 301-02)

Plaintiff completed a Function Report – Adult, reporting that she had difficulty getting out of bed in the morning because her knees were swollen. During the day, Plaintiff tried to exercise. She took medication that made her nauseous. She did some chores when she was not dizzy. Plaintiff took care of her son, who was diabetic and schizophrenic. She had trouble sleeping. Plaintiff was able to cook meals, clean, and do laundry when her knees permitted.

Plaintiff drove a car and could go out alone. She shopped in stores and by computer once or twice a month. She enjoyed reading and playing card games. Plaintiff reported that she spent time with others and regularly attended church, attended doctor appointments, and visited family members. She further stated that her conditions affected her ability to lift, squat, bend, stand, walk, sit, kneel, climb stairs, see, remember, complete tasks, concentrate, and get along with others. She could pay attention, finish what she started, follow written and spoken instructions, and get along with authority figures. She had never been fired because of problems getting along with others. However, she did not handle stress well. (Tr. 332-39)

## III. Medical Evidence

On April 17, 2007, Plaintiff complained of high blood pressure and stress. Ingrid Taylor, M.D., assessed pure hypercholesterolemia; disorders of the thyroid; hypertension; major depressive affective disorder, recurrent episode, mild degree; and a skin infection. (Tr. 455-56)

On August 11, 2009, Plaintiff stated that she was depressed and very tired. She also complained of knee pain and acknowledged that she was not doing her exercises as prescribed. Dr. Robert Baird assessed major depressive affective disorder, recurrent episode, mild degree; hypothyroidism; pain in joint involving lower leg; hypertension; and hyperlipidemia. (Tr. 607-08) Plaintiff returned to Dr. Baird on September 22, 2009. Plaintiff reported that her mood was better. However, she was not sleeping. Dr. Baird prescribed Trazodone for sleep. (Tr. 605)

Lloyd Irwin Moore, Ph.D., examined Plaintiff on September 28, 2009 at the request of Missouri Disability Determinations. Plaintiff stated that she was last employed in 1995. Her company downsized, and she also experienced health problems and deaths in her family. She reported being depressed, unmotivated, and lethargic. Dr. Moore observed that Plaintiff was cooperative and thoughtful. Her mood was depressed. Plaintiff performed poorly on short-term

6

memory but could do mathematical equations of a simple nature. Her fund of knowledge was intact, and proverb interpretation was fair to good. Dr. Moore noted that Plaintiff's judgment and psychological insight were fair to good. She was debilitated by her mood, and she was hyper-vigilant about her medical condition. Dr. Moore diagnosed major depressive disorder; multiple physical problems, including pain disorder; occupational problems; and a global assessment functioning ("GAF") of 45.[3] He noted that Plaintiff claimed she was unable to lift, bend, stand, or stoop. She had isolated herself from social interaction. She had deficits in concentration, persistence, and pace due to dysthymia. Dr. Moore opined that Plaintiff was able to handle funds. (Tr. 524-28)

On November 4, 2009, Robert Cottone, Ph.D., completed a Mental Residual Functional Capacity Assessment. He found marked limitations in Plaintiff's ability to understand and remember detailed instructions and ability to carry out detailed instructions. She was moderately limited in her ability to maintain attention and concentration for extended periods, sustain an ordinary routine without special supervision, work in coordination with or proximity to others

---

[3] The Court notes that DSM-V was released in 2013 and replaced the DSM-IV. The DSM-V "no longer uses GAF scores to rate an individual's level of functioning because of 'its conceptual lack of clarity' and 'questionable psychometrics in routine practice.'" *Alcott v. Colvin*, No. 4:13-CV-01074-NKL, 2014 WL 4660364, at *6 (W.D. Mo. Sept. 17, 2014) (citing *Rayford v. Shinseki*, 2013 WL 3153981, at *1 n.2 (Vet. App. 2013) (quoting the DSM-V)). However, because the DSM-IV "was in use when the medical entries were made and the [ALJ's] decision was issued in this matter, the Global Assessment of Functioning scores remain relevant for consideration in this appeal." *Rayford*, 2013 WL 3153981, at *1 n.2.

Under the Diagnostic and Statistical Manual of Mental Disorders, a GAF score of 41 to 50 indicates "serious symptoms . . . OR any serious impairment in social, occupational, or school functioning (e.g., few friends, unable to keep a job)." *Diagnostic and Statistical Manual of Mental Disorders (DSM-IV-TR)* 34 (4th ed. 2000). A GAF score of 51 to 60 indicates "moderate symptoms . . . OR moderate difficulty in social, occupational, or school functioning," and a GAF score of 61 to 70 indicates "some mild symptoms . . . OR some difficulty in social, occupational, or school functioning . . . but generally functioning pretty well, has some meaningful interpersonal relationships." *Id.*

without being distracted by them, complete a normal workday without interruption from psychologically based symptoms, and accept instructions and respond appropriately to criticism from supervisors. Dr. Cottone opined that Plaintiff must avoid jobs involving intense or extensive interpersonal interaction; handling complaints or dissatisfied customers; or working in close proximity to co-workers. (Tr. 540-42)

Dr. Baird examined Plaintiff on December 22, 2009 for a follow up and medication refill. Plaintiff complained of worsening depression and paranoia with some mild hallucinations. Dr. Baird referred Plaintiff to social services for mental health care. (Tr. 602) That same date, Plaintiff saw Darnetta Carter, LCSW. Plaintiff reported being depressed and feeling stressed. She had not received consistent mental health treatment. Ms. Carter referred Plaintiff to psychiatry. (Tr. 601)

Plaintiff underwent an Adult Psychiatric Evaluation on February 22, 2010. The examining psychiatrist observed that Plaintiff was well-groomed, cooperative, and tearful. Her affect was depressed, and her thought process was logical. Her insight and judgment were fair. Diagnoses included major depressive disorder with psychosis, severe, and rule out prolonged grief. Her GAF was 65. (Tr. 573-76) On March 8, 2010, the psychiatrist noted signs of improvement, and Plaintiff's affect was a little brighter. On May 1, 2010, Plaintiff was sad and tearful. The doctor added Abilify to Plaintiff's medication. On June 28, 2010, Plaintiff reported doing better on Abilify. Her mood was good, but she reported experiencing bad dreams and hearing voices. (Tr. 570-72)

On August 23, 2010, Dr. German Corso saw Plaintiff for a medication management follow-up. Plaintiff reported improvement but continued to feel depressed. She denied any side effects from her medications. Dr. Corso increased Plaintiff's Fluoxetine and continued her

8

Trazodone and Abilify. He encouraged Plaintiff to exercise 30 minutes per day and follow a healthy diet. He referred Plaintiff to therapy. (Tr. 569)

Plaintiff began psychotherapy treatment with Marva M. Robinson, Psy.D., on September 10, 2010. Dr. Robinson noted that Plaintiff was clearly suffering from a deep depression. She had poor eye contact moments and was often dissociated and tearful through the interview. Dr. Robinson assessed major depressive disorder, recurrent, severe with psychotic features; bipolar I disorder, most recent episode depressed, severe with psychotic features; and a GAF of 45. (Tr. 558-62)

On September 17, 2010, Plaintiff reported that she tried to take a walk but stopped because people were staring at her. Dr. Robinson encouraged Plaintiff to walk down the block twice during the week and to choose a day to get out of bed by 9:00 a.m. and not return. On September 24, 2010, Dr. Robinson noted that Plaintiff did not cry until 25 minutes into the session which was great progress. Plaintiff reported feeling better but was still severely depressed. When Plaintiff returned to Dr. Robinson on November 3, 2010, she reported trying and feeling a little better. Dr. Robinson opined that Plaintiff was bipolar I as opposed to just major depressive disorder. On November 17, 2010, Plaintiff had some progress but was still tearful during the session. Plaintiff's mood continued to be labile, and she reported nightmares and talking to people that were not present. Dr. Robinson opined that Plaintiff's condition was so severe that the concept of employment was impossible. She therefore recommended starting out slowly by volunteering a few hours a week. (Tr. 563-65)

On November 19, 2010, Dr. Robinson completed a Mental Medical Source Statement. She diagnosed major depressive disorder, recurrent, severe with psychotic features; and bipolar I disorder, most recent episode depressed with psychotic features. In activities of daily living, Dr.

9

Robinson opined that Plaintiff had moderate limitations in her ability to meet personal needs, function independently, and maintain personal appearance. She had a marked restriction in her ability to behave in an emotionally stable manner. Dr. Robinson further opined that Plaintiff had extreme limitations in her ability to cope with stress and maintain reliability. With regard to social functioning, Dr. Robinson assessed moderate limitations to Plaintiff's ability to maintain socially acceptable behavior. Plaintiff had a marked limitation in her ability to accept instructions and respond to criticism, and she had extreme limitations in her ability to relate in social situations and interact with the general public. (Tr. 553-54)

Further, in terms of concentration, persistence, and pace, Dr. Robinson found moderate limitations to Plaintiff's ability to understand and remember simple instructions, maintain regular attendance and be punctual, and sustain an ordinary routine without special supervision. She had a marked limitation in her ability to maintain attention and concentration for extended periods. In addition, Dr. Robinson opined that Plaintiff was extremely limited in her ability to work in coordination with others, make simple work-related decisions, perform at a consistent pace, and respond to changes in work setting. Dr. Robinson believed that Plaintiff's impairment would cause unpredictable interruptions 3 to 4 times during a normal work day. She opined that Plaintiff required 1 to 2 years before she was able to return to work. Plaintiff would also be tardy and absent multiple times a month. Plaintiff's most recent GAF was 45. (TR. 555-56)

On November 22, 2010, Dr. Corso noted that Plaintiff was doing better but continued to have auditory hallucinations. However, she was negative for hallucinations on exam. Dr. Corso continued Plaintiff's prescriptions and encouraged her to exercise and follow a healthy diet. (Tr. 568) That same date, Dr. Corso completed a Mental Medical Source Statement. He diagnosed major depressive disorder with psychotic features, moderate, recurrent. In activities of daily

10

living, Dr. Corso opined that Plaintiff had moderate limitations in her ability to meet personal needs, cope with stress, function independently, maintain personal appearance, and maintain reliability. She had a marked restriction in her ability to behave in an emotionally stable manner. With regard to social functioning, Dr. Corso assessed mild limitations in Plaintiff's ability to maintain socially acceptable behavior. Plaintiff had a moderate limitation in her ability to accept instructions and respond to criticism, and she had marked limitations in her ability to relate in social situations and interact with the general public. (Tr. 578-79)

Additionally, in terms of concentration, persistence, and pace, Dr. Corso found a mild limitation to Plaintiff's ability to understand and remember simple instructions. She was moderately limited in her ability to maintain regular attendance and be punctual, sustain an ordinary routine without special supervision, work in coordination with others, make simple work-related decisions, and perform at a consistent pace. She had marked limitations in her ability to maintain attention and concentration for extended periods and respond to changes in a work setting. Dr. Corso believed that Plaintiff's impairment would cause unpredictable interruptions during a normal work day and normal work week. He opined that Plaintiff potentially would arrive late to work unpredictably. Plaintiff's most recent GAF was 60. (Tr. 580-81)

On December 8, 2010, Dr. Robinson noted that Plaintiff was not in good shape. She was frustrated with her psychiatrist and her lack of progress. Dr. Robinson indicated that she spoke with Dr. Corso, and he did not feel Plaintiff had any mania symptoms. However, he agreed to reassess Plaintiff to see if she needed a medication change. On December 15, 2010, Plaintiff was more hopeful. Dr. Robinson encouraged Plaintiff consistently use her coping skills, use her treadmill daily, and focus on the positive in her life. (Tr. 636-37)

11

Plaintiff returned to Dr. Corso on January 17, 2011. Plaintiff reported more mood swings, with episodes of increased energy and talkativeness and decreased sleep. She stated that she continuously heard voices and was frustrated with her life. Plaintiff was cooperative during the exam with fair eye contact. Her mood was okay, and her affect was restricted. Dr. Corso opined that he should consider other diagnoses such as bipolar affective disorder or schizoaffective disorder. He suggested contacting the family for more history, as Plaintiff was a poor historian. Dr. Corso increased Plaintiff's Abilify dosage. Plaintiff denied side effects from the medication. (Tr. 749-50)

On February 28, 2011, Dr. Corso noted that Plaintiff was doing better since increasing Abilify. Her mood was more stable, and the voices were better. In addition, her episodes of increased energy were less frequent. Dr. Corso noted that Plaintiff was cooperative with fair eye contact. Dr. Corso again increased Plaintiff's Abilify dosage. (Tr. 748)

After canceling or failing to show for a few appointments, Plaintiff returned to Dr. Robinson on March 16, 2011. Plaintiff reported success with using coping skills. She was still severely depressed but appeared brighter than usual. On March 31, 2011, Plaintiff was very depressed with many new stressors. Plaintiff lost her home and was living with her sister. She was frustrated with medication not working. However, she reported feeling much better and not being as depressed as she was 6 months ago. (Tr. 638)

On April 11, 2011, Dr. Corso noted that Plaintiff continued to do well since increasing Abilify. She had not taken her medication for 3 days. She reported being less irritable and labile. Her auditory hallucinations were not as bad as before. Dr. Corso found Plaintiff to be cooperative with a better mood. She denied side effects from the medications. (Tr. 747)

12

Plaintiff saw Dr. Robinson on April 14, 2011. Plaintiff was still frustrated with her medication. Plaintiff reported feeling less psychotic than before the Abilify increase. On April 28, 2011, Plaintiff stated that she was doing better overall. She became tearful when Dr. Robinson informed her that she was leaving the agency. (Tr. 638)

On May 23, 2011, Plaintiff reported feeling depressed with problems sleeping. She asked Dr. Corso for a medication increase. Dr. Corso agreed to increase the Abilify and Trazodone dosages. (Tr. 744-46)

Michelle W. Goldstein, ACSW, evaluated Plaintiff on May 26, 2011. Plaintiff reported going to church and for walks. Plaintiff also reported that the Abilify and Trazodone were helping. On June 8, 2011, Ms. Goldstein noted that Plaintiff was extremely depressed. They explored performing volunteer work and improving health. (Tr. 639)

On June 20, 2011, Plaintiff told Dr. Corso that she felt dull and had difficulty being spontaneous since he increased the Abilify. Dr. Corso decreased the Abilify dosage. (Tr. 742)

Plaintiff returned to Ms. Goldstein on June 23, 2011. Plaintiff reported feeling slightly better. She began exercising which reduced her anxiety. She also enjoyed visiting with her nieces and nephews. Plaintiff was exploring volunteer opportunities. Ms. Goldstein noted that Plaintiff's mood was improved and suggested vitamin supplements for increased energy and mood. (Tr. 640)

On July 25, 2011, Dr. El-Ruwie evaluated Plaintiff. She reported doing okay, but she still felt depressed most of the time. Her energy was decreased, and she felt hopeless at times. She did not experience side effects from the medications. Dr. El-Ruwie added Wellbutrin to Plaintiff's medication regimen. (Tr. 740)

Plaintiff returned to Ms. Goldstein on August 18, 2011. She reported feeling better with more energy on Wellbutirn. She had not followed up on volunteering. She continued to have problems sleeping. On October 5, 2011, Plaintiff felt about the same. She was unable to find volunteer work. Ms. Goldstein indicated that Plaintiff's case was closed on January 26, 2012 due to inactivity. Plaintiff had made mild progress. (Tr. 640-41)

On October 17, 2011, Dr. El-Ruwie noted that Plaintiff had missed several appointments. She was still depressed but feeling better with no mania symptoms. She was looking for jobs. (Tr. 704) On April 9, 2012, Plaintiff was in a good mood and reported feeling better. She had no side effects from medications. In an off service note, Dr. El-Ruwie noted that Plaintiff had a diagnosis of schizoaffective disorder, in stable condition. She was feeling better and taking her medications, with no side effects. Plaintiff responded well to the medications, with very few medication adjustments over the past year. She had no psychosis and started looking for jobs. (Tr. 732-34)

Plaintiff was examined by Dr. Graypel on July 16, 2012. Plaintiff reported continued episodes of low mood and problems sleeping. She preferred to stay away from people but enjoyed attending church often. Dr. Graypel continued Plaintiff's medication. (Tr. 731)

On August 2, 2012, Dr. Baird noted that Plaintiff suffered from profound depression. Plaintiff stated that she was unable to work for the past six or seven years. She reported crying all the time and an inability to get out of bed on many days. Dr. Baird questioned why Plaintiff was not on disability. During a subsequent appointment with Dr. Baird, Plaintiff reported that new medication prescribed by her psychiatrist was not working. (Tr. 650-53)

Plaintiff returned to Dr. Graypel in October and November 2012. On October 22, 2012, she reported having a manic episode with high energy for over a week. She then became

14

depressed. On November 19, 2012, Plaintiff was doing well with recent medication changes. Her mood was improved, and she felt more stable. (Tr. 698-700)

On March 11, 2013, Plaintiff told Dr. Graypel that her mood had been down for 3 weeks. She was irritable and felt upset because she had been doing so well. (Tr. 724-25) Dr. Graypel completed a Mental Medical Source Statement on April 22, 2013. He opined that Plaintiff had moderated limitations in her ability to cope with normal work stress and function independently. She was markedly limited in her ability to behave in an emotionally stable manner. Her ability to function depended and varied upon whether she was manic or depressed. Dr. Graypel further stated that Plaintiff had moderate limitations in her ability to interact with the general public, accept instructions and respond to criticism, and maintain socially acceptable behavior. She had marked limitations in her ability to relate in social situations. With regard to concentration, persistence, or pace, Plaintiff was mildly restricted in her ability to sustain an ordinary routine without special supervision. She had moderate limitations in her ability to understand and remember simple instructions, make simple work-related decisions, maintain attention to work tasks for up to 2 hours, perform at a consistent pace, respond to changes in work setting, and work in coordination with others. Her impairment could cause unpredictable interruptions, tardiness, or absences from work if Plaintiff was experiencing an exacerbation of symptoms. Dr. Graypel diagnosed bipolar disorder. (Tr. 753-56)

## IV. The ALJ's Determination

In a decision dated June 11, 2013, the ALJ found that Plaintiff met the insured status requirements of the Social Security Act through December 31, 2011. She had not engaged in substantial gainful activity since September 28, 2009, the amended alleged onset date. Plaintiff's severe impairments included hypothyroidism, hypercholesterolemia, hypertension, obesity,

15

bilateral joint pain of the knees, schizoaffective disorder, and major depressive disorder. However, she did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. 17-22)

After carefully considering the entire record, the ALJ found that Plaintiff had the residual functional capacity ("RFC") to perform light work that included the limitations of occasional kneeling; no climbing of ladders, ropes, or scaffolds; and understanding, remembering, and carrying out at least simple instructions and non-detailed tasks. The ALJ further found that Plaintiff was unable to perform any past relevant work. Based on Plaintiff's younger age on the alleged onset date, high school education, work experience, and RFC, the ALJ determined that jobs existed in significant numbers in the national economy that Plaintiff could perform. These jobs included fast food worker, cashier, or housekeeping cleaner. Therefore, the ALJ concluded that Plaintiff had not been under a disability, as defined in the Social Security Act, from September 28, 2009, through the date of the decision. (Tr. 22-30)

## V. Legal Standards

A claimant for social security disability benefits must demonstrate that he or she suffers from a physical or mental disability. The Social Security Act defines disability "as the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 404.1505(a).

To determine whether a claimant is disabled, the Commissioner engages in a five step evaluation process. *See* 20 C.F.R. § 404.1520(a)(4). Those steps require a claimant to show: (1) that claimant is not engaged in substantial gainful activity; (2) that she has a severe physical or

mental impairment or combination of impairments which meets the duration requirement; or (3) she has an impairment which meets or exceeds one of the impairments listed in 20 C.F.R., Subpart P, Appendix 1; (4) she is unable to return to her past relevant work; and (5) her impairments prevent her from doing any other work. *Id.*

The Court must affirm the decision of the ALJ if it is supported by substantial evidence. 42 U.S.C. § 405(g). "Substantial evidence means less than a preponderance, but sufficient evidence that a reasonable person would find adequate to support the decision." *Hulsey v. Astrue*, 622 F.3d 917, 922 (8th Cir. 2010). "We will not disturb the denial of benefits so long as the ALJ's decision falls within the available zone of choice. An ALJ's decision is not outside the zone of choice simply because we might have reached a different conclusion had we been the initial finder of fact." *Buckner v. Astrue*, 646 F.3d 549, 556 (8th Cir. 2011) (citations and internal quotations omitted). Instead, even if it is possible to draw two different conclusions from the evidence, the Court must affirm the Commissioner's decision if it is supported by substantial evidence. *See Young v. Apfel*, 221 F.3d 1065, 1068 (8th Cir. 2000).

To determine whether the Commissioner's final decision is supported by substantial evidence, the Court must review the administrative record as a whole and consider: (1) the credibility findings made by the ALJ; (2) the plaintiff's vocational factors; (3) the medical evidence from treating and consulting physicians; (4) the plaintiff's subjective complaints regarding exertional and non-exertional activities and impairments; (5) any corroboration by third parties of the plaintiff's impairments; and (6) the testimony of vocational experts when required which is based upon a proper hypothetical question that sets forth the plaintiff's impairment. *Johnson v. Chater*, 108 F.3d 942, 944 (8th Cir. 1997) (citations and internal quotations omitted).

17

The ALJ may discount a plaintiff's subjective complaints if they are inconsistent with the evidence as a whole, but the law requires the ALJ to make express credibility determinations and set forth the inconsistencies in the record. *Marciniak v. Shalala*, 49 F.3d 1350, 1354 (8th Cir. 1995). It is not enough that the record contain inconsistencies; the ALJ must specifically demonstrate that she considered all the evidence. *Id.* at 1354.

When a plaintiff claims that the ALJ failed to properly consider subjective complaints, the duty of the court is to ascertain whether the ALJ considered all of the evidence relevant to plaintiff's complaints under the *Polaski*[4] factors and whether the evidence so contradicts plaintiff's subjective complaints that the ALJ could discount the testimony as not credible. *Blakeman v. Astrue*, 509 F.3d 878, 879 (8th Cir. 2007) (citation omitted). If inconsistencies in the record and a lack of supporting medical evidence support the ALJ's decision, the Court will not reverse the decision simply because some evidence may support the opposite conclusion. *Marciniak*, 49 F.3d at 1354.

## VI. Discussion

Plaintiff raises two related arguments in her Brief in Support of the Complaint. First, Plaintiff asserts that the ALJ erred in rejecting the opinions of three different treating physicians. Second, Plaintiff claims that the ALJ erred by failing to incorporate into Plaintiff's RFC certain limitations set forth by Dr. Cottone. Defendant responds that the ALJ properly considered the medical opinion evidence in determining Plaintiff's RFC and properly determined that Plaintiff

---

[4]  The Eight Circuit Court of Appeals "has long required an ALJ to consider the following factors when evaluating a claimant's credibility: '(1) the claimant's daily activities; (2) the duration, intensity, and frequency of pain; (3) the precipitating and aggravating factors; (4) the dosage, effectiveness, and side effects of medication; (5) any functional restrictions; (6) the claimant's work history; and (7) the absence of objective medical evidence to support the claimant's complaints.'" *Buckner v. Astrue*, 646 F.3d 549, 558 (8th Cir. 2011) (quoting *Moore v. Astrue*, 572 F.3d 520, 524 (8th Cir. 2009)) (citing *Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984)).

18

could perform other work. The Court will address both of Plaintiff's arguments together, as they pertain to the weight given to medical opinion evidence.

The Plaintiff first argues that the ALJ erred in rejecting the opinions of three different treating physicians in formulating Plaintiff's RFC. Plaintiff notes that psychologist Dr. Robinson assessed extreme, marked, and moderate limitations in all activities of daily living; social functioning; and concentration, persistence, and pace. She opined that Plaintiff would be tardy or absent frequently and that Plaintiff's impairments would cause frequent unpredictable interruptions during the work day. Plaintiff also states that Dr. Corso assessed several marked and moderate limitations and opined that Plaintiff's impairment would cause unpredictable interruptions during the work day and work week. Further, she could potentially arrive late to work. Finally, Dr. Graypel found mostly moderate and some marked limitations in all areas of functioning. He opined that Plaintiff could have problems with reliability and punctuality if she experienced exacerbation of symptoms.

Plaintiff asserts that the ALJ failed to accord proper weight to these opinions and instead found that the objective medical evidence and subjective findings failed to support such extreme limitations. Plaintiff claims that the ALJ's justification for giving little weight to the opinions of Drs. Robinson, Corso, and Graypel was inadequate. Defendant, on the other hand, argues that the ALJ properly assigned little weight to those opinions because the opinions were internally inconsistent and also inconsistent with other substantial evidence in the record.

With regard to Plaintiff's residual functional capacity, "a disability claimant has the burden to establish her RFC." *Eichelberger v. Barnhart*, 390 F.3d 584, 591 (8th Cir. 2004) (citation omitted). The ALJ determines a claimant's RFC "'based on all the relevant evidence, including medical records, observations of treating physicians and others, and [claimant's] own

19

description of her limitations.'" *Page v. Astrue*, 484 F.3d 1040, 1043 (8th Cir. 2007) (quoting *Anderson v. Shalala*, 51 F.3d 777, 779 (8th Cir. 1995)). RFC is defined as the most that a claimant can still do in a work setting despite that claimant's limitations. 20 C.F.R. § 404.1545(a)(1).

The record shows that the ALJ properly considered the medical evidence and based the RFC determination on the evidence contained in the record. With regard to Plaintiff's mental health treatment with Drs. Robinson, Corso, and Graypel, the Court notes that "[a] treating physician's opinion should not ordinarily be disregarded and is entitled to substantial weight . . . provided the opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record." *Singh v. Apfel*, 222 F.3d 448, 452 (8th Cir. 2000) (citations omitted); *see also* SSR 96-2P, 1996 WL 374188 (July 2, 1996) ("Controlling weight may not be given to a treating source's medical opinion unless the opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques."). The ALJ need not give controlling weight to a treating physician's opinion where the physician's treatment notes were inconsistent with the physician's RFC assessment. *Goetz v. Barnhart*, 182 F. App'x 625, 626 (8th Cir. 2006). Further, "[i]t is appropriate to give little weight to statements of opinion by a treating physician that consist of nothing more than vague, conclusory statements." *Swarnes v. Astrue*, Civ. No. 08-5025-KES, 2009 WL 454930, at \*11 (D.S.D. Feb. 23, 2009) (citation omitted); *see also Wildman v. Astrue*, 596 F.3d 959, 964 (8th Cir. 2010) (finding that the ALJ properly discounted a treating physician's opinion where it consisted of checklist forms, cited no medical evidence, and provided little to no elaboration).

20

Here, the doctors all found moderate to extreme limitations in Plaintiff's functional abilities. However, as noted by the ALJ, the objective medical evidence and the subjective findings failed to support such extreme limitations. For example, when doctors prescribed the right medication dosage, Plaintiff had multiple periods of improvement. Dr. Robinson noted Plaintiff's progress throughout therapy. (Tr. 563-65, 637-38) During medication management follow-up appointments in 2010, Dr. Corso noted that Plaintiff was doing fairly well but still somewhat depressed. She reported some improvement with medication and frustration that she was not improving faster. (Tr. 568-69) A 2012 Off Service Note from Dr. El-Ruwie indicated that Plaintiff responded well to medication over the course of a year with few adjustments. She had no psychosis and was looking for a job. (Tr. 732) Likewise, in January 2013, Dr. Graypel noted that Plaintiff's condition had improved, with better sleep and mood. (Tr. 726) "An impairment which can be controlled by treatment or medication is not considered disabling." *Estes v. Barnhart,* 275 F.3d 722, 725 (8th Cir. 2002) (citation omitted); *see also Brace v. Astrue,* 578 F.3d 882, 885 (8th Cir. 2009) ("There is substantial evidence that, when taken as directed, the medication [plaintiff] was prescribed was successful in controlling his mental illness.").

As stated above, the ALJ need not give controlling weight to a treating physician's opinion where the physician's treatment notes were inconsistent with the physician's RFC assessment. *Goetz,* 182 F. App'x at 626. Additionally, the ALJ may properly give little weight to an opinion that consists of vague, conclusory statements or is merely a checklist with no elaboration. *Swarnes,* 2009 WL 454930, at *11; *Wildman,* 596 F.3d at 964. As the questionnaires completed by Drs. Robinson, Corso, and Graypel contained limitations far more severe than indicated in the treatment record and failed to include any medical evidence or explanation, the ALJ properly gave those opinions little weight.

21

Plaintiff additionally argues that the ALJ erred in giving Dr. Cottone's opinion great weight yet failing to incorporate that opinion into Plaintiff's RFC. Specifically, Plaintiff contends that the ALJ failed to incorporate moderate limitations in Plaintiff's ability to maintain concentration, persistence, or pace in the RFC determination. (Tr. 22, 28, 540-41) The ALJ's RFC finding, however, belies Plaintiff's contention. The ALJ explicitly accounted for Plaintiff's deficits in concentration, persistence, or pace by limiting Plaintiff to understanding, remembering and carrying out at least simple instructions and non-detailed tasks.[5] This limitation sufficiently encompasses the moderate restrictions to concentration, persistence, or pace found by Dr. Cottone and given great weight by the ALJ. *Howard v. Massanari*, 255 F.3d 577, 582 (8th Cir. 2001) (finding a hypothetical question limiting the plaintiff to at least simple, repetitive, routine tasks adequately captured plaintiff's deficiencies in concentration, persistence, or pace). Thus, the ALJ did not err in her assessment and incorporation of Dr. Cottone's opinion into the RFC determination.

The Court also notes that Plaintiff's activities are inconsistent with her allegations of disability. Plaintiff argues in her reply that her ability to meet the physical demands of daily living does not demonstrate an ability to meet the mental demands. However, the record shows that Plaintiff reported caring for her disabled son, preparing meals, cleaning her house, doing laundry, shopping, socializing with friends and family, handling money, playing card games, and

_____

[5] In the hypothetical question posed to the VE, the ALJ asked the VE to assume a person limited to unskilled work due to her mental impairment. (Tr. 92) Courts in this district have determined that a limitation to unskilled work in a hypothetical question or RFC determination encompasses limitations in concentration, persistence, or pace. *See, e.g., Faint v. Colvin*, 26 F. Supp. 3d 896, 911-12 (E.D. Mo. 2014) (finding no error in the RFC determination or hypothetical to the VE that failed to explicitly include limitations to concentration, persistence, or pace but limited the plaintiff to simple, unskilled work); *Bense v. Colvin*, No. 4:14CV890 NCC, 2015 WL 5675238, at *24 (E.D. Mo. Sept. 25, 2015) (finding hypothetical describing plaintiff as able to perform unskilled work adequately incorporated the RFC limiting plaintiff to understanding, remembering, and carrying out simple instructions and non-detailed tasks).

22

going to church. (Tr. 26-27, 333-38) These activities involve more than physical exertion. As found by the Eighth Circuit, an ability to engage in a number of daily activities detracts from Plaintiff's credibility that she is disabled due to mental impairments. *See, Roberson v. Astrue*, 481 F.3d 1020, 1023, 1025 (8th Cir. 2007) (affirming the ALJ's credibility analysis where the plaintiff diagnosed with bipolar syndrome took care of her child, drove, fixed simple meals, performed housework, shopped, and handled money).

Contrary to Plaintiff's argument that the ALJ failed to properly assess the opinion evidence in the record in determining Plaintiff's RFC, the Court finds that the ALJ's RFC assessment is supported by medical evidence contained in the record as a whole. The ALJ need not rely entirely on a particular doctor's opinion or choose between opinions. *Martise v.Astrue*, 641 F.3d 909, 927 (8th Cir. 2011). Here, the ALJ properly performed an exhaustive analysis of the medical records and noted the inconsistencies in the record between the treating source's opinions and other substantial evidence. *Id.* at 926. Further, the ALJ set forth properly assessed and discredited Plaintiff's allegations of a disabling mental impairment. Therefore, the undersigned finds that substantial evidence supports the ALJ's RFC determination, and Court will affirm the final decision of the Commissioner.

Accordingly,

**IT IS HEREBY ORDERED** that the final decision of the Commissioner denying social security benefits is **AFFIRMED**. A separate Judgment in accordance with this Memorandum and Order is entered this same date.

Dated this 24th day of March, 2016.

**RONNIE L. WHITE**
**UNITED STATES DISTRICT JUDGE**

23